IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-183

No. COA20-534

Filed 4 May 2021

Gaston County, No. 18 CRS 3691, 56251, 56323, 56326, 56327; 19 CRS 5616

STATE OF NORTH CAROLINA

v.

SCOTT WARREN FLOW

Appeal by defendant from judgments entered 20 December 2019 by Judge Nathan H. Gwyn, III in Gaston County Superior Court. Heard in the Court of Appeals 14 April 2021.

> *Attorney General Joshua H. Stein, by Assistant Attorney General Rebecca E. Lem, for the State.*
>
> *Mark Montgomery for defendant-appellant.*

TYSON, Judge.

¶ 1 Scott Warren Flow ("Defendant") appeals from judgments entered upon a jury's verdict. We find no error.

## I. Background

¶ 2 Defendant met "Hannah" in the spring of 2017, and they began a romantic, but non-sexual, relationship (pseudonym used to protect complainant's identity). Around Thanksgiving of 2017, Defendant and Hannah were waiting inside a vehicle in a

parking lot to pick up Hannah's daughter, Brooklin, when she got off of work. While in the car, Defendant became agitated as Hannah was texting her niece.

¶ 3        After Brooklin entered the car, Defendant "sped[] off . . . [was] cussing, and got mad." Brooklin tried to calm Defendant during the drive to Hannah's house. After Defendant pulled the car into the carport, he began "cussing and raging."

¶ 4        Hannah's house was decorated for Christmas. Defendant took Christmas presents from under the tree and threw them across the house. Defendant left the house. Hannah ended their relationship. Defendant was upset and responded Hannah "would regret ever having known him."

¶ 5        On Christmas Day 2017, Hannah, Brooklin, and Brooklin's boyfriend discovered both of Hannah's car tires on the right side were flat. Hannah was alarmed and sought and received a Domestic Violence Protective Order ("DVPO") against Defendant in February 2018 under N.C. Gen. Stat. § 50B-1(b)(6) (2019).

¶ 6        Hannah's mother was hospitalized after Christmas 2017 with double pneumonia. Hannah was visiting her mother at the hospital. Defendant came into Hannah's mother's room at the hospital. Hannah tried to avoid him by leaving the room. Defendant sought to speak with Hannah in the waiting room of the hospital. Hannah told Defendant she could not speak with him because of the DVPO. Defendant apologized to Hannah for his actions. Defendant and Hannah then spoke for about twenty minutes.

¶ 7        Hannah and Defendant began communication via text messaging and telephone. Defendant admitted to and apologized for puncturing Hannah's tires. Hannah and Defendant began seeing each other again in person.

¶ 8        On 26 May 2018, Hannah picked up Brooklin to go shopping. While they were in the car, Defendant called Hannah screaming: "I'm being shot at, I'm being shot at[.]" Hannah called Defendant back. Defendant stated he was with his friend, Johnny Max, at Max's house. Max's father or father-in law had started shooting at him.

¶ 9        While Hannah and Brooklin were in a store, Defendant called Hannah on Facetime video from the front porch of Hannah's niece, Christine's, house. Defendant said he was hiding from law enforcement officers because of the incident at Max's house. Defendant believed 911 had been called with a description of his car. Hannah asked Defendant to leave Christine's house.

¶ 10       Defendant again called Hannah, reporting he was "going to kill a ni--er." Hannah believed Defendant may harm her older daughter's, boyfriend, who was black. Hannah left Brooklin at her house babysitting Hannah's two grandchildren, Armoni and Daeja. Hannah drove to her other daughter's house. Defendant was not there.

¶ 11       Brooklin and Armoni were in the kitchen around 7:30 p.m. Brooklin heard a car pulling into the driveway. Daeja was in her crib upstairs. Brooklin recognized

Defendant and told Armoni to go upstairs. Brooklin locked the door and went to make sure Armoni had hidden herself. Brooklin went to the laundry room to look outside.

¶ 12 Brooklin observed Defendant get out of his car and approach the back door. Defendant banged on the door with his fist, then began kicking the door. Brooklin heard the door crack, saw Defendant walking from the living room, down the hallway, and into Hannah's bedroom. Brooklin called out to Defendant to ask what he was doing. Defendant did not respond. Brooklin could hear Defendant rummaging through Hannah's dressers. Brooklin saw Defendant come out of Hannah's bedroom with her mother's two guns.

¶ 13 Defendant approached Brooklin yelling for her to call her mother. Defendant demanded to know why Hannah was not answering his calls and ignoring him. Brooklin responded she did not know Hannah was ignoring him and Defendant was scaring her. Brooklin was too afraid to call 911. Brooklin called and texted Hannah but received no response. Brooklin contacted her neighbor, Brittany Brady, who told her to get Armoni and Daeja out of the house.

¶ 14 Around this time, Hannah arrived home. Hannah saw Defendant's car in the driveway, and observed the French doors in the back of the house were open. Brooklin was behind the door. Hannah brushed by Defendant to get Daeja from her crib and then got Armoni. Brady arrived and took Daeja, Armoni, and Brooklin from the house.

¶ 15    Once Brooklin and her grandchildren were gone, Defendant began to drag Hannah upstairs toward her bedroom.  Once both were inside the bedroom, Defendant pushed Hannah onto the floor, commanding, "Bitch, get on the floor." After Hannah was on the floor, Defendant walked over and put the gun to the back of her head.  He told Hannah she was taking her last breath, because he was going to "blow her brains out."

¶ 16    Defendant grabbed Hannah by her hair, pulled her up to her knees, and shoved her into the bathroom.  Defendant entered the bathroom and locked the door. Defendant grabbed Hannah by the neck, placed a gun to her temple, and said, "You used me, didn't you, bitch, you used me." and "You better tell me what I want to hear or I'll blow your brains out."  Defendant then put the gun to her eye socket and again threatened to "blow [her] brains out."  Hannah begged Defendant for her life.

¶ 17    Defendant had Hannah sit on the floor and not move her hands.  Defendant smoked a cigarette and cracked open the bathroom door.  Defendant told Hannah "It wasn't supposed to end like this, you were supposed to come to South Carolina, I was gonna kill my daddy and then you and then myself."

¶ 18    Defendant saw police vehicles' blue lights outside.  The lights alarmed Defendant, who grabbed Hannah and put his arm around her throat.  Defendant told Hannah to call 911, demanding for the police officers to turn off their blue lights, or he was going to "blow her brains out."  When Hannah tried to get her hair out of her

face, Defendant hit her in the face with the butt of the gun.

¶ 19        Hannah called 911.  Defendant told Hannah he was not worried about what was going to happen to him, Gaston County was an "easy" county, and the State of North Carolina does not have "hard rules."  Defendant hit Hannah's head against the bathroom sink a couple of times.  Defendant hit Hannah in the mouth and told her to "stop her damn crying," he "didn't want to hear that whiny mess."

¶ 20        Defendant made Hannah straddle the toilet and remove his penis from his pants.  Defendant urinated on Hannah then made her put his penis back into his pants.  Hannah attempted to wipe Defendant's urine off of her.  Defendant grabbed Hannah's pants and told her to remove them.  Hannah initially refused, but she took off her pants and shirt after Defendant threatened to blow her kneecaps off.

¶ 21        Defendant removed his own pants and positioned himself behind Hannah.  Defendant unsuccessfully attempted to insert his penis in Hannah's rectum.  Hannah told Defendant he was hurting her and to stop.  Defendant attempted but was unable to penetrate Hannah's vagina with his penis. He dragged Hannah out of the bathroom into the bedroom.

¶ 22        Inside the bedroom, Defendant ordered Hannah to get onto her knees.  Defendant positioned himself behind Hannah, placed a gun to the back of her head, and inserted his penis into her vagina.  Defendant made Hannah turn over onto her back and again inserted his penis into her vagina.

¶ 23        While these events were unfolding, Gaston County police officers were attempting to contact Hannah.  Defendant got off Hannah, told her to lie across the bed and to "suck his penis."  Defendant grabbed Hannah by her hair, inserted his penis into her mouth, and moved her head up and down.  Hannah told Defendant she did not want her children to see her like this and begged to be allowed to put her clothes back on.

¶ 24        Defendant intermittently allowed Hannah to answer her cell phone and speak with police.  The officers asked Defendant to release Hannah.  When Defendant said he was thirsty, Hannah offered to go get him water.  Defendant put his arm around Hannah's neck, put a gun to her temple, and made Hannah walk in front of him as a shield while getting water.

¶ 25        As Defendant and Hannah entered the living room, Defendant became agitated and pulled Hannah backwards into a bathroom.  Defendant shut and locked the door.  Defendant spoke with police on Hannah's phone.  Defendant ordered Hannah to call her pastor and her pastor's wife, but neither answered Hannah's call.  Hannah's pastor's wife returned her call, and Defendant told Hannah to talk to her now while she could.

¶ 26        Defendant then grabbed Hannah by her arm and led her back into the bedroom.  Defendant locked the bedroom door.  Defendant told Hannah to take her clothes off and used his free hand, while holding the gun on her with the other, to pull

her clothes off of her. Defendant got on top of Hannah and again inserted his penis into her vagina. With a gun in his hand, Defendant instructed Hannah to get on top of him and again inserted his penis into her vagina. Defendant instructed Hannah to move, but she was unable to make herself move. Defendant allowed Hannah to get off of him, and he got behind her and re-inserted his penis in her vagina. When Defendant finished, he stood up and allowed Hannah to put her pants and shirt on.

¶ 27        Hannah had her cell phone on speaker with police officers. Defendant used his cell phone to call his uncle, Ronnie Moore, but the call went to voicemail. Defendant was able to reach Moore's daughter, Jennifer, and told her, " I wished you could come get me but I've done something really bad this time, you can't come pick me up." Hannah told police on her phone Defendant was threatening to kill her.

¶ 28        When Defendant's phone went dead, Defendant looked over at Hannah and said, "It's time." Hannah responded, "what do you mean it's time[?]" Defendant said, "I'm gonna kill you and I'm gonna kill myself." Defendant reached up and grabbed Hannah by her neck with his arm, and he pulled her down toward him. Defendant said he was going to blow her brains out. Hannah began to scream and tried to get away. Hannah got to the edge of the bed when she heard a loud noise.

¶ 29        Gaston County police officers had initiated an emergency rescue of Hannah. When the emergency response team reached the back bedroom, they observed Hannah on the floor between Defendant's legs. Defendant had his arm around her

neck and was holding a gun to her head. The emergency response team was able to subdue Defendant in handcuffs and grab Hannah, pulling her out of the room to safety. Police recovered two revolvers at the scene.

¶ 30 Hannah was transported to the hospital, where medical professionals took Hannah's medical history and a description of the assault. Hospital staff took photographs of Hannah's injuries; conducted a physical exam; and took swabs of her fingernails, mouth, vaginal, and genital areas. The anal swab, vagina swabs, and genital swabs contained Defendant's DNA profile.

¶ 31 Defendant was indicted for possession of a firearm by a felon, four counts of first-degree kidnapping, burglary, DVPO violation with a deadly weapon, two counts of first-degree rape, and first-degree forcible sex offense. Defendant's charges were joined for trial beginning on 9 December 2019. Defendant was present in court for *voir dire*, opening statements, the testimony of all witnesses, and the closing arguments to the jury from both sides.

¶ 32 The morning of the sixth day of the trial before the jury was to be charged, Defendant was being escorted from the Gaston County Jail. At some point, Defendant indicated he had forgotten his glasses in his cell and asked if he could go and get them. Defendant was standing over the ledge of the second-floor mezzanine. Detention officers reported to the second-floor mezzanine after being told Defendant was "hanging" on the second-floor mezzanine approximately sixteen feet off of the

ground.  Detention officers told Defendant not to jump, but Defendant jumped feet first.  Defendant fell onto a metal table and landed on the ground.  Defendant suffered injuries to his left leg and ribs.  Defendant was transported to the hospital and underwent surgery to reduce a fracture in his femur.

¶ 33    The trial court conducted a hearing to determine whether Defendant's absence from trial was voluntary.  The trial court considered and denied Defendant's counsel's motion for the court to make further inquiry into his capacity to proceed.

¶ 34    The trial court ruled Defendant had voluntarily absented himself from the proceedings, and the trial would continue without Defendant present.  The jury charge, jury deliberations, and sentencing commenced without Defendant present in the courtroom.  Defendant's counsel objected to each phase proceeding outside of Defendant's presence.

¶ 35    The jury returned verdicts and found Defendant guilty of two counts of first-degree forcible rape, first-degree kidnapping, first-degree forcible sexual offense, second degree burglary, false imprisonment, possession of a firearm by a convicted felon, and DVPO violation with a deadly weapon.

¶ 36    Defendant was sentenced to consecutive sentences of 276 to 392 months for the first-degree forcible sexual offense, and two sentences of 276 to 392 for each first-degree forcible rape.  Defendant's convictions for first-degree kidnapping, second degree burglary, DVPO violation with a deadly weapon, possession of a firearm by a

felon, and false imprisonment were consolidated for judgment. Defendant was sentenced to 180 to 228 months to run consecutive to his other consecutive sentences. Defendant was ordered to register as a sex offender for the remainder of his natural life. Defendant's counsel gave oral notice of appeal in open court.

## II. Jurisdiction

¶ 37      This Court possesses jurisdiction pursuant to N.C. Gen. Stat. §§ 7A-27(b) and 15A-1444(a) (2019).

## III. Issues

¶ 38      Defendant argues the trial court erred by denying Defendant's counsel's motion to conduct an inquiry into his capacity to proceed. Defendant also argues the court's instructions on first-degree sexual offense deprived Defendant of his right to a unanimous jury verdict.

## IV. Capacity to Proceed

¶ 39      Defendant argues the trial court erred in denying the defense's motion for an inquiry into Defendant's capacity to proceed.

### A. Standard of Review

¶ 40      "The standard of review for alleged violations of constitutional rights is de novo." *State v. Anderson*, 222 N.C. App. 138, 142, 730 S.E.2d 262, 265 (2012).

### B. Necessity of Hearing

¶ 41      Our Supreme Court recently reviewed this issue. When a defendant's capacity

to proceed is questioned, the court must determine whether a hearing is necessary. The court must decide "whether there was substantial evidence before the trial court as to [the defendant's] lack of capacity to truly make such a voluntary decision." *State v. Sides*, 376 N.C. 449, 459, 852 S.E.2d 170, 177 (2020). "[T]he decision whether to grant a motion for commitment for psychiatric examination to determine competency to stand trial lies within the sound discretion of the trial judge." *State v. Williams*, 38 N.C. App. 183, 189, 247 S.E.2d 620, 623 (1978). "The method of inquiry [is] within the discretion of the trial judge, the only requirement being that defendant be accorded due process of law." *State v. Gates*, 65 N.C. App. 277, 281, 309 S.E.2d 498, 501 (1983).

¶ 42        Criminal defendants possess the constitutional right to be present at all stages of their trial. *See Kentucky v. Stincer*, 482 U.S. 730, 745, 96 L. Ed. 2d 631, 647 (1987). However, where the offense is non-capital, the Supreme Court has held a defendant may waive that right where they "voluntarily absent" themselves. *See Taylor v. United States*, 414 U.S. 17, 19, 38 L. Ed. 2d 174, 177 (1973).

¶ 43        Our Supreme Court has recognized a "trial court has a constitutional duty to institute, sua sponte (sic), a competency hearing if there is substantial evidence before the court indicating that the accused may be mentally incompetent." *State v. Young*, 291 N.C. 562, 568, 231 S.E.2d 577, 581 (1977); *see also* N.C. Gen. Stat. § 15A-1002 (2019).

¶ 44        When evaluating whether a *sua sponte* competency hearing is necessary, a trial judge must conduct a fact-intensive inquiry. *Sides*, 376 N.C. at 466, 852 S.E.2d at 181–82. Previously, courts have considered a defendant's answers to the trial court's questions and whether their responses were "lucid and responsive" to demonstrate and support a defendant's competence. *State v. Staten*, 172 N.C. App. 673, 680, 616 S.E.2d 650, 655 (2005). Additionally, "[e]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant" to an inquiry regarding a defendant's competency. *State v. McRae*, 139 N.C. App. 387, 390, 533 S.E.2d 557, 559 (2000).

¶ 45        In *Sides*, the Supreme Court reviewed a defendant's appeal, who was charged with four counts of felony embezzlement. After the first three days of trial, the defendant intentionally ingested sixty Xanax tablets. *Sides*, 376 N.C. at 450, 852 S.E.2d at 172. A doctor evaluated the defendant and recommended she be involuntarily committed. He checked the box on the petition form describing her as "mentally ill and dangerous to self or others or mentally ill and in need of treatment in order to prevent further disability or deterioration that would predictably result in dangerousness." *Id.*

¶ 46        A magistrate found reasonable grounds to believe the defendant required involuntary commitment, and she began a period of commitment. *Id.* at 451, 852 S.E.2d at 172. A psychiatrist evaluated her the next day, and noted the defendant

remained suicidal and required inpatient stabilization. *Id.*

¶ 47 Our Supreme Court held the trial court erred by presuming the defendant's suicide attempt was a voluntary waiver of her right to be present at the trial. Pursuant to her attempt, the trial court sought information on whether the absence was voluntary or involuntary. *Id.* at 451, 852 S.E.2d at 173. The trial court recessed the proceedings after reviewing draft orders from the State. *Id.* at 452, 852 S.E.2d at 173.

¶ 48 The trial court intended to wait until the following Monday, when the defendant would be released, or the trial court would have access to her medical records. *Id.* at 452-53, 852 S.E.2d at 173-74. Proceedings resumed on the following Monday, while the defendant remained in the hospital. *Id.* at 453, 852 S.E.2d at 174. The trial court read the defendant's medical records, which included the recommendation from doctors that she remain hospitalized, as well as information about her history of a mood disorder and her prescriptions: Haldol for agitation, Vistaril for anxiety, Trazodone to help her sleep, and 100 milligrams of Zoloft daily. Further, the trial court confirmed with defense counsel that neither the court nor counsel had observed anything indicating the defendant lacked competency to proceed at trial. *Id.* at 453-54, 852 S.E.2d at 174. The trial court ruled defendant "voluntarily by her own actions made herself absent from the trial" over defense counsel's objection. *Id.* at 454-455, 852 S.E.2d at 174.

¶ 49        The Court held that while a defendant may voluntarily waive the constitutional right to be present at trial, the defendant may only waive the right when they are competent. *Id.* at 456, 852 S.E.2d at 175. The Supreme Court concluded the trial court had erred "by essentially skipping over the issue of competency and simply [pre]summing . . . defendant's suicide attempt was a voluntary act that constituted a waiver of her right to be present during her trial, [and] both the majority at the Court of Appeals and the trial court 'put the cart before the horse.'" *Id.* at 456-57, 852 S.E.2d at 176.

¶ 50        "Once the trial court had *substantial evidence* that defendant may have been incompetent, it should have sua sponte (sic) conducted a competency hearing to determine whether she had the capacity to voluntarily waive her right to be present during the remainder of her trial." *Id.* at 457, 852 S.E.2d at 176 (emphasis supplied).

¶ 51        Our Supreme Court held:

> In such cases, the issue is whether the trial court is required to conduct a competency hearing before proceeding to determine whether the defendant made a voluntary waiver of her right to be present, or, alternatively, whether it is permissible for the trial court to forego a competency hearing and instead assume a voluntary waiver of the right to be present on the theory that the defendant's absence was the result of an intentional act.

*Id.* at 456, 852 S.E.2d at 175–76.

¶ 52        Our Supreme Court further held:

> [T]he issue of whether substantial evidence of a
> defendant's lack of capacity exists so as to require a sua
> sponte (sic) competency hearing requires a fact-intensive
> inquiry that will hinge on the unique circumstances
> presented in each case. *Our holding should not be
> interpreted as a bright-line rule that a defendant's suicide
> attempt automatically triggers the need for a competency
> hearing in every instance.* Rather, our decision is based on
> our *consideration of all the evidence in the record when
> viewed in its totality.*

*Id.* at 466, 852 S.E.2d at 182 (emphasis supplied).

¶ 53        During Defendant's trial, the trial court did not have a detailed mental health history nor was substantial evidence presented or any prior notice or actions tending to show Defendant may have been incompetent. In *Sides*, the court was provided with a large amount of evidence and history, including physicians' diagnoses and recommendations concerning the defendant's documented mental health concerns. The trial court was informed the defendant had "a number of medical conditions by her and her family" and defense counsel offered to obtain more information from her doctors. *Id.* at 451, 852 S.E.2d at 173.

¶ 54        Because nothing in Defendant's prior record, conduct, or actions provided the trial court with notice or evidence Defendant may have been incompetent, the court did not err by declining to conduct a more intensive hearing on Defendant's capacity to proceed. The trial court had the opportunity to personally observe Defendant's conduct and demeanor, heard arguments from both the State and defense counsel,

and took evidence concerning Defendant's competency.

¶ 55    The State argued Defendant had answered questions appropriately and clearly and was able to participate in trial and confer and communicate with counsel. The State also argued Defendant's decision to harm himself had no bearing on whether he possessed the mental capacity to assist in his own defense. Defense counsel challenged his client's competency under N.C. Gen. Stat. § 15A-1002 and stated jumping sixteen feet from the second-floor mezzanine may have been a suicide attempt.

¶ 56    Also, without the jury present, the trial court heard testimony from Shana Withers, a public defender investigator, who testified about her visit with Defendant at the hospital where he was being treated.

¶ 57    Additionally, the trial court heard from a jailhouse deputy, Darrell Griffin, who was present when Defendant jumped from the second-floor mezzanine. He testified Defendant had not previously demonstrated prior episodes of mental or emotional disturbance and described the scene when Defendant jumped from the second-story mezzanine. After hearing the testimony of Withers, Officer Griffin and viewing recorded footage of Defendant dropping from the mezzanine, the trial court found Defendant had voluntarily absented himself from the proceedings.

¶ 58    This Court has stated, "a trial judge is required to hold a competency hearing when there is a *bona fide* doubt as to the defendant's competency even absent a

request." *Staten*, 172 N.C. App. at 678, 616 S.E.2d at 654-55 (citation omitted). "Failure of the trial court to protect a defendant's right not to be tried or convicted while mentally incompetent deprives him of his due process right to a fair trial." *State v. McRae*, 139 N.C. App. 387, 389, 533 S.E.2d 557, 559 (2000) (citations omitted). "Evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant to a bona fide doubt inquiry." *Id.* at 390, 533 S.E.2d at 559 (citation and quotation marks omitted).

¶ 59    Here, and unlike the facts in *Sides*, Defendant engaged in two lengthy colloquies with the trial court and later waived his right not to testify. These colloquies lead to this Court's analysis in *State v. Staten*.

¶ 60    In *Staten,* the defendant wanted to testify on his own behalf. *Staten,* 172 N.C. App. at 679, 616 S.E.2d at 655. The trial court conducted the following colloquy to determine the voluntariness of the defendant's testimony and his understanding of possible outcomes:

> [The Court]: All right. Mr. Staten, you have talked to your attorney concerning the question of whether or not you should testify or not in this case?
>
> [Defendant]: Yes Sir.
>
> [The Court]: And you understand that if you do testify the State can ask you a lot of questions on cross-examination about your prior record and things of that nature?
>
> [Defendant]: Yes sir.

> [The Court]: And you understand that may sway the jury somewhat? Sometimes it does. And it could be that it doesn't work out to your advantage.
>
> [Defendant]: Yes sir.
>
> [The Court]: Are you telling me now that even though you understand the consequences of your decision to testify you still want to go through with it?
>
> [Defendant]: I want to testify and tell everybody like came [sic] behind me and testified after I already testified and say something about me and I want to testify again to clear up what they have said like we did the last time.

*Id.* at 679-80, 616 S.E.2d at 655.

¶ 61     The Court found "the defendant's replies were lucid and responsive, demonstrating his desire to testify and displaying his understanding of the consequences of doing so." *Id.* at 680, 616 S.E.2d at 655. These factors demonstrated the defendant was competent to stand trial. *Id.*

¶ 62     Here, two similar colloquies between the trial court and Defendant occurred. The trial court inquired about Defendant's voluntariness to testify on his own behalf.

> THE COURT: [Defendant], have you been able to go over with your attorneys your choice of whether or not to testify?
>
> THE DEFENDANT: Yes, Your honor.
>
> THE COURT: Just answer yes or no. You have?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And have they answered all your questions

about that?

THE DEFENDANT: Yes, sir.

THE COURT: And how are you feeling today? Is your mind clear?

THE DEFENDANT: Yes.

THE COURT: Are you taking any kind of medicines or any kind of substances at all that would affect how you think or feel?

THE DEFENDANT: No, sir.

THE COURT: So your mind is clear as we have this conversation?

THE DEFENDANT: Correct, yes, sir.

THE COURT: And you realize you have the right not to testify?

THE DEFENDANT: Yes, sir.

THE COURT: Do you also realize, as a result of your conversation with the attorneys, that you have the right to testify?

THE DEFENDANT: Yes, sir.

THE COURT: You have both of those rights.

THE DEFENDANT: Right.

THE COURT: And you understand that at this juncture, at this point in the trial, it is your decision entirely as to whether or not you decide to testify or not. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: It is not your lawyer's decision, it's not the DA's decision, it's not my decision, it's your decision and your decision alone. So have you been able to think some this afternoon about whether or not you want to testify?

THE DEFENDANT: Yes, sir, I have.

THE COURT: And what is your decision?

THE DEFENDANT: I'm not going to testify.

¶ 63     The following Monday, after the weekend recess, the trial court conducted another colloquy with Defendant to determine whether he had changed his mind over the weekend. Like the exchanges in *Staten*, these colloquies and Defendant's answers to the trial court's questions also demonstrate and support presumption and the trial court's conclusion of Defendant's competence. Defendant engaged in lengthy colloquies with the trial court, Defendant's responses were "lucid and responsive." *Id.*

¶ 64     Here, unlike in *Sides*, the trial court heard and considered the evidence necessary to determine Defendant's competency, no substantial evidence tends to show or support a finding Defendant may have been incompetent. The trial court was not required to hold an additional *sua sponte* competency hearing. The court had conducted the appropriate fact-intensive inquiry and found and concluded Defendant had voluntarily waived his right to be present at trial.

¶ 65     The trial court considered the facts that Defendant did not display any inappropriate conduct at trial, nor that Defendant had a prior medical history, which raised any question of his competence. The trial court did not err in denying the

defense motion for further inquiry into Defendant's capacity. Defendant's argument is without merit and is overruled. *Sides*, 376 N.C. at 466, 852 S.E.2d at 181–82.

## V. Jury Instruction

¶ 66 Defendant argues the trial court's jury instruction on sexual offense deprived Defendant of his right to a unanimous jury verdict. The trial court's instruction states, *inter alia*:

> A sexual act means either cunnilingus, which is any touching, however slight, by the lips or tongue of one person to any part of the female sex organ of another. Fellatio, which is any touching by the lips or tongue of one person and the male sex organ of another. Anal intercourse, which is any penetration, however slight, of the anus of any person by the male sex organ of another. Or any penetration, however slight, by an object into the genital or anal opening of a person's body.

¶ 67 The trial court instructed the jury it could find Defendant guilty of a first-degree sexual offense, if, in addition to the other required elements it found Defendant had engaged in fellatio or anal intercourse. These are not disparate crimes, but are "merely alternative ways of showing the commission of a sexual act." *State v. Petty*, 132 N.C. App. 453, 463, 512 S.E.2d 428, 434-35 (1999).

¶ 68 The unchallenged evidence from Hannah's testimony meets the statutory requirements of N.C. Gen. Stat. §14-27.26 (2019). Our Supreme Court and our Court have consistently held a jury verdict does not need to make a specific finding regarding precisely which sexual acts proscribed by N.C. Gen. Stat. § 14-27.26

defendant committed. *See State v. Hartness*, 326 N.C. 561, 391 S.E.2d 177 (1990); *State v. McCarthy*, 326 N.C. 782, 392 N.C. 359 (1990); *State v. Petty*, 132 N.C. App. 453, 512 S.E.2d 428 (1999). We are bound by our Supreme Court's and this Court's prior precedents. *See In re Civil Penalty*, 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989). Defendant's argument is overruled.

## VI. Conclusion

The trial court properly denied Defendant's counsel's motion to conduct an additional inquiry into his capacity to proceed following his intentional act to injure himself, to voluntarily absent himself from trial. The trial court's jury instruction on first-degree sexual offense, which can be committed by multiple acts, did not deprive Defendant of his right to a unanimous jury verdict.

If Defendant required greater specificity, he could have moved for a bill of particulars under N.C. Gen. Stat. § 15A-925 (2019) and/or for a special verdict sheet under N.C. Gen. Stat. § 15A-1340.16 (2019).

Defendant received a fair trial, free from prejudicial errors he preserved and argued. We find no error in the jury's verdicts or the judgments entered thereon. *It is so ordered.*

NO ERROR.

Judges COLLINS and CARPENTER concur.